# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs March 22, 2016

## STATE OF TENNESSEE v. UNJOLEE TREMONE MOORE

**Appeal from the Criminal Court for Hamilton County**
**No. 280014   Don W. Poole, Judge**

_____

**No. E2015-00942-CCA-R3-CD – Filed September 20, 2016**

_____


A jury convicted the defendant, Unjolee Tremone Moore, of first degree felony murder; attempted especially aggravated robbery, a Class B felony; attempted second degree murder, a Class B felony; and the employment of a firearm during the commission of or attempt to commit a dangerous offense, a Class C felony.  On appeal, the defendant challenges the sufficiency of the evidence, the trial court's refusal to dismiss based on the failure of police to collect a co-defendant's telephone, and the trial court's decision to admit the defendant's  statement to police into evidence.  After a thorough review of the record, we conclude that the defendant is not entitled to relief, and we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Brandon Raulston (at motion for new trial and on appeal); and R. Garth Best and Kelli L. Black (at trial), Chattanooga, Tennessee, for the appellant, Unjolee Tremone Moore.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Neal Pinkston, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The defendant's convictions stem from a plan laid by the defendant and his co-defendants, Steven James Ballou, Harold Francis Butler, and John Thomas Simpson, to rob the murder victim, Bernard Hughes. According to the defendant's statement to police, he planned to rob the murder victim because the victim sold marijuana and would not call the police. When two of the co-defendants demanded the victim's money, the victim resisted the robbery and was killed. The victim's friend, Tim Westfield, sustained a gunshot wound when he attempted to aid the victim in fighting off two of the co-defendants. The defendant acknowledged to police that he was the driver and had helped to plan the crime. In his statement, he implied that Myra Collier, a witness who was present in the victim's home, might have been involved with the robbery.

The defense moved, prior to trial, to suppress the defendant's statement to police, arguing that he had been denied his right to counsel and that he had not signed a rights waiver. The defendant also asserted that he was entitled to relief based on law enforcement's failure to record the entire interview in which he gave his statement. The transcript of the hearing on this motion is not part of the record before us. In its written order, the trial court summarized the testimony at the suppression hearing by noting that Investigator Michael Wenger had testified that the defendant was advised of his rights and never requested a lawyer. Investigator Wenger noted that the interview was recorded in two separate audio files because the batteries on his recording device failed during the interview. When Investigator Wenger left the room to change the battery, two agents in the Alcohol, Tobacco, and Firearms division continued to speak to the defendant, and this portion of the interview was summarized in their report. At some point after the batteries were replaced, the memory on the device became full, and it could no longer record. Investigator Wenger had experienced problems with the device on three or four prior occasions. According to the trial court's order, the defendant testified that he did not sign the rights waiver and that he had asked for a lawyer several times. The trial court denied the motion to suppress the statement or to dismiss the indictment for failure to preserve the entire statement, but the court stated it would give an instruction to the jury regarding the break in the recording.

Prior to trial, the defendant also joined the other co-defendants in moving to dismiss the indictment based on law enforcement's failure to collect a cellular telephone that had belonged to co-defendant Harold Butler. The transcript of this hearing has been supplemented per the defendant's request and is now a part of the appellate record. Investigator Wenger testified that on July 13, 2010, after the defendant's arrest, he received a call from the fugitive division informing him that the telephone of Harold

Butler had been found. The telephone was not in Mr. Butler's possession, however, but in the possession of Antonio Watkins. Investigator Wenger testified that Lieutenant Edwin McPherson was on the scene and that Lieutenant McPherson told him "not to take the phone and to not question anyone about it." When he asked why, Lieutenant McPherson told him that the federal marshals on the scene needed it. Investigator Wenger then received a call from his commander, Sergeant Bill Phillips, telling him that he was to obey the order from Lieutenant McPherson. Sergeant Phillips confirmed that he called Investigator Wenger, and he testified that he was prompted to do so by Lieutenant Eidson, who instructed him to tell Investigator Wenger to "to leave the phone alone." Sergeant Phillips asked Investigator Wenger to note the interaction in his report, and Sergeant Phillips testified that he had never had such a request in twenty-three years.

Investigator Wenger testified that the federal marshals told him they no longer needed the telephone and that they then talked to Lieutenant McPherson. As a result, Lieutenant McPherson said, "Well, go ahead and interview Mr. Watkins about it, but don't take the phone." Investigator Wenger testified that he believed it was an iPhone and that he was not able to navigate the telephone. As a result, he was able to find pictures of Mr. Butler but was not able to find the text messages or any associated social media accounts. Mr. Watkins told Investigator Wenger that he had bought the telephone three days earlier. Investigator Wenger did not find anything of significance to the investigation on the telephone. He stated that he believed he was able to get call records for Mr. Butler, and that what might have been lost "was stuff that was actually stored in the phone."

Lieutenant McPherson testified that Myra Collier, one of the witnesses to the murder, was his niece. He stated it was "possible" that she gave him information on the case. When asked if she had called him on June 29, 2010, he responded that he had put her in touch with Investigator Wenger. Lieutenant McPherson did not deny ordering Investigator Wenger not to recover the telephone and or speaking to Lieutenant Eidson, but he stated that he did not recall doing either.

Mr. Watkins testified that he had bought the telephone from a man in front of the "Okey-Dokey." He denied that the man was Mr. Butler, and he stated that the telephone had no photos or other information on it when he got it. He stated that he had owned "a thousand" telephones since that time, that he does not keep telephones long, and that he has never had an iPhone. He recalled that the telephone was "cheap" but denied telling police that he got it from a man and a woman in a white Altima or that he traded two "dime bags" of marijuana for it. Investigator Wenger testified in rebuttal that Mr. Watkins had said that he bought the telephone from Mr. Butler, who was the passenger in a white Altima, and that Mr. Watkins stated the telephone was given in exchange for two

"dime bags" of marijuana. The trial court denied the motion to dismiss, concluding that the materiality of the telephone was "entirely speculative."

At trial, Myra Collier testified that she had known the victim for sixteen years and that he was her best friend. Ms. Collier had been in a relationship with one of the co-defendants, Mr. Ballou, and he and the defendant were acquainted with the victim because they had come to the victim's house a few months prior to the homicide to see Ms. Collier. The victim sold marijuana from his house.

On June 28, 2010, Ms. Collier and Cindy Cross spent the afternoon at the victim's apartment. After dinner, Timothy Westfield came to see the victim. Ms. Collier testified that they had obtained liquor prior to Mr. Westfield's arrival but that she did not think they had consumed much alcohol. She acknowledged that, according to a crime scene photograph, the bottle of gin they had been consuming contained only about one-half of one inch of liquid.

Ms. Collier testified at trial, although Ms. Cross did not. Ms. Collier testified that she did not hear the knock when the assailants came to the door because she was in the bathroom. When she emerged, Ms. Cross told Ms. Collier that she thought the victim was being robbed, and Ms. Cross said she heard gunshots. The two women ran upstairs. Ms. Collier did not recall Mr. Westfield telling her to go upstairs. She looked out of a window and did not see anything, and she did not hear gunshots herself. The two were upstairs only briefly. When they came down, they unlocked the door and saw the victim lying on the porch, bleeding. Ms. Collier stated she checked the victim's pulse and that he was not breathing. She acknowledged that she did not try to perform CPR despite her prior nursing experience. Ms. Collier testified that she ran to get a police officer who lived at the apartment complex. She did not recall calling 911. She acknowledged having called her uncle, Captain Edwin McPherson, but stated the telephone call occurred prior to the robbery.

On cross-examination, Ms. Collier did not recall telling the police that she did not know the defendant at all, and she stated that she knew his face but did not know his name. She acknowledged having gone on a trip with her cousin Ariel on Memorial Day weekend, but she could not recall if she spoke with the defendant by telephone on that trip. She did not know the location of the telephone to which the defendant may have placed the Memorial Day weekend call. Ms. Collier did not recall telling police that she did not introduce the defendant and the victim, although she testified, "but I guess I probably didn't." She denied having anything to do with the robbery or murder of the victim.

-4-

Mr. Westfield, who had known the victim since they were children, testified that he came to the victim's house on June 28, 2010, between 10:30 and 11:00 p.m. to socialize and to help the victim with a computer. When he arrived, two of the victim's friends, Ms. Cross and Ms. Collier, were sitting outside, and the victim was on his way home. The four went inside when the victim arrived, and Ms. Collier's cousin stopped by to borrow some DVDs and then left. The four had been inside at least twenty minutes, and the victim seemed "on edge," when they heard a knock. Mr. Westfield testified that Ms. Collier was not in the bathroom at the time of the knock. Ms. Collier, however, had testified that she was in the bathroom. According to Mr. Westfield, the victim looked out of the peephole, then turned to Mr. Westfield and gave him "a peculiar look." The victim opened the door, went out immediately, and closed the door behind him.

While the door was open, Mr. Westfield saw a shorter man and a taller man standing outside. Mr. Westfield identified the taller man as John Simpson. The shorter man was wearing a "do-rag" or half-mask over his face with two colors, black and teal, and he had a gun. The shorter man was about five feet, four inches tall, had a tall bridge on his nose, and light eyes. Mr. Westfield acknowledged that he did not recognize the man at the time, but he stated that "as soon as I found out who it was, I knew it went two and two together." At trial he identified the shorter man as Harold Butler, whom he described as unique in appearance. Mr. Westfield testified that Mr. Butler's stature was consistent with wearing a size eight shoe. While the victim was passing out of the door, Mr. Westfield could see that the shorter man had a gun, and he heard the shorter man say, "Lay it down," which was a demand for the victim's possessions.

Mr. Westfield testified that he told the two women to go upstairs and that he went outside to assist the victim. Mr. Westfield testified at first that he opened the door, saw the men scuffling, then shut the door, at which point it jammed. He later stated that the door was jammed when he first tried to open it. One of the women told him that it was only locked, and he opened it and went outside.

Outside, both of the men were hitting the victim on top of the head, and the victim was fighting back. Mr. Westfield leaped at the taller man. He heard three shots and saw two flashes in his eyes, and then everything went black. Mr. Westfield regained consciousness in a bush and saw the victim lying on the porch. He did not see blood at first and attempted to administer cardiopulmonary resuscitation ("CPR"), but "when I blew in his mouth and squeezed his nose, my finger went through his nostril where the bullet went in at and that's how I found the bullet wound, and when I bl[ew] in it, the matter came out of the back of his head." Mr. Westfield observed the shorter man hiding behind the fender of a nearby car, and the man got in a late-model silver car with dark windows. Mr. Westfield saw a shoe and baseball cap at the scene. He discovered that he had a gunshot laceration on his forearm and that the tip of one finger had been essentially

severed by a bullet. Mr. Westfield acknowledged that he had told police the shorter man said something like "break yourself" instead of "lay it down," but he testified that the two phrases had the same meaning. He told police that the car was either a Maxima or an Altima. He did not recall saying that the car was gold and not silver, but he did not deny it, explaining that he was "going crazy" at the emergency room. He acknowledged that he only saw two men and that neither of the assailants was the defendant.

Mr. Westfield stated he did not know if the victim had received complaints that too many people were coming to his house, and he stated that the victim had told him that the victim no longer sold marijuana. He did not recall telling law enforcement at the hospital that the victim had been getting complaints because he had too many visitors. Mr. Westfield acknowledged that the victim and his guests had been drinking alcohol on the evening of the homicide.

Investigator Michael Wenger testified that he was assigned to investigate the case. He interviewed witnesses and visited the scene. Investigator Wenger was looking for the defendant and found him in a parked 1999 gold or silver Nissan Maxima on July 9, 2010. The owner of the vehicle and the defendant's girlfriend, Michelle Angel, was in the passenger seat. Investigator Wenger testified that he gave the defendant *Miranda* warnings and that the defendant signed a rights waiver prior the interview. He acknowledged having failed to sign as a witness on the waiver and stated that he was not aware that the defendant had been in special education or could not read until the eleventh grade. Officer Phillip Narramore and a federal agent were also assisting with the interview. Investigator Wenger testified regarding the failed battery and the memory problem with the recording device. He stated that he left the interview room to download the contents of the recording device, and when he returned "we had gotten most of what we needed, so I didn't continue with the interview." The interview began on July 9th and ended on July 10th. The defendant was permitted to take breaks and given dinner. The interview lasted four to six hours, but the defendant was at the station for ten to twelve hours.

In the recorded interview, the defendant acknowledged his involvement in the crimes. The defendant stated that "Ariel" had told him that the victim sold marijuana. The defendant knew the victim by sight through Ariel but did not know the victim's name. According to the defendant, he and Mr. Butler had spoken about robbing a "dope boy," and they targeted a drug dealer because "[t]o be honest with you those was the easiest ones to get in the street . . . uh . . . cause like a dope boy won't call police." The defendant said that he and Mr. Butler spoke of the robbery at Mr. Butler's house approximately a week before the crimes, and at that time, he told Mr. Butler, "I could use some money too. I told 'em about maybe Bernard." The defendant told Mr. Butler that the victim did not keep a gun. At first, the defendant stated that he and Mr. Butler were

-6-

alone during the conversation, but he later told police that Mr. Simpson was there as well. The defendant told police that Mr. Butler had a .38 revolver, a Hi-Point .45 caliber firearm, and a pump shotgun at his house.

The defendant also acknowledged that he anticipated sharing in the profits of the robbery. He stated that he "let [Mr. Butler] do it all" and just wanted to "collect a cut on the side." The defendant stated that "[t]hey promised to break me off . . . a little of what I get," and he stated he would gain "[a] cut out of it." More specifically, the defendant expected to get approximately $3,000 if $10,000 were taken, which he stated was forty percent. The defendant would get this money because he "turned him onto it."

At first, the defendant acknowledged only taking the assailants to the apartment earlier in the day, and he denied being on the scene during the homicide. According to the defendant, on the day of the homicide, he took Mr. Butler and another man to the victim's house, where several people standing outside saw them. The defendant told the people that he was not hard to find and drove off. The defendant told police that during the homicide, Mr. Butler was driving a gold Maxima, "[s]ame kind as my girl's."

After police told the defendant that they had evidence putting him at the scene, the defendant admitted that he was "over there," although he insisted that he "never got out of the car." He stated, "I picked 'em up. I dropped 'em off." The defendant told law enforcement that he was in the car behind the apartment the entire time, heard gunshots, and saw Mr. Butler and Mr. Simpson come around a corner. Mr. Butler was delayed because he had been looking for a lost shoe. According to the defendant, Mr. Simpson was armed with a .38 revolver, and Mr. Butler was armed with a .45 Hi-Point.

The defendant stated at first that he could not see from where he was sitting. However, he eventually described the conflict, noting that after Mr. Butler knocked, Mr. Butler "told [the victim] lay it down." The defendant described a man coming to the victim's aid. According to the defendant, Mr. Butler fired a shot in the air, and Mr. Simpson then emerged from the bushes and fired twice. The defendant stated that Mr. Butler then fired again. The house door opened and closed, and someone inside the house fired out. The defendant dropped Mr. Butler and Mr. Simpson at Mr. Butler's home and then went to his girlfriend's house. The defendant stated that he "didn't expect it to happen like that." He elaborated later that he did not know or expect that anyone would get killed. The defendant told police that they did not acquire anything in the robbery. In his statement, the defendant implied that Ms. Collier "had something to do with it."

Investigator Wenger stated that during his investigation, he spoke with Ms. Collier and discovered that she had called her uncle after the homicide. She had also made two

-7-

911 calls that did not go through. He acknowledged that one witness at the scene had seen a tan van and that the defendant also described a tan SUV. Investigator Wenger also acknowledged that both a co-defendant and a witness said that the getaway vehicle hit another car as it was leaving but that he was unable to locate damage on Ms. Angel's Maxima or any car at the scene. Investigator Wenger stated that the other officers spoke to the defendant while Investigator Wenger was out of the room and acknowledged that he did not know if the defendant was threatened. He stated that he was not lying when he told the defendant that they could place him at the scene because law enforcement had telephone records indicating that the defendant was there. Investigator Wenger acknowledged that a woman named Ariel had been in an argument that night with the victim and that her telephone records were not investigated. Police did not locate the two weapons which fired the shots, but they found a pump shotgun at Mr. Butler's residence. Officer Narramore of the Chattanooga Police Department testified that he did not remember questioning the defendant while Investigator Wenger was out of the room. Neither he nor the federal agent threatened or coerced the defendant during the interview.

Police officers found a live round and two bullet casings at the scene. A bullet was recovered from the frame of the doorway. They also discovered a baseball cap and a size 8 shoe. They swabbed a pool of vomit or bodily fluid found beside a vehicle.

From the gold Maxima, law enforcement recovered two cellular telephones, a ski-mask type facial wrap, a turquoise blue bandana, and a pair of size 8 ½ shoes from the trunk. Investigator Kenneth Burnette, Jr., acknowledged that he did not collect another pair of shoes in the trunk and that he did not know if the size 8 ½ shoes were men's or women's. He stated that he also recovered guns from the home of the defendant's mother and girlfriend.

Dr. James Metcalfe, the medical examiner, testified that the victim had marijuana in his system and a blood alcohol content of .139 percent. The victim died of two gunshot wounds, both of which were fatal. One bullet entered the victim's left chest toward the back, traveled through both lungs and the heart, exited the chest, and lodged in the right arm above the elbow. The other bullet entered his right temple and eventually lodged by the left occipital bone. The medical examiner testified that blood was coming from the victim's nostrils but that his nasal bones appeared intact. He also testified that the victim's ribs did not show breakage or other signs of CPR but that he could not rule out that CPR had been performed. The victim exhibited no bruising showing his head or body had been "stomped" or struck with a hard object, but he had an abrasion near the belly button, an abrasion on the left hand, and two scrapes on the left shoulder. The victim had $97 and a "dagger" in his pocket.

The shoe recovered from the scene had DNA that was a mixture from at least three individuals. Dr. Laura Boos, a special agent forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified that she was able to exclude the victim, the defendant, and two of the co-defendants as contributors. The test was inconclusive regarding whether Mr. Westfield or Mr. Butler were contributors to the DNA in the shoe. The defendant's DNA was recovered from the black facial wrap found in the trunk of his girlfriend's car. The blue bandana from the car had DNA that was a mixture from three individuals. The test excluded all the profiles submitted except the defendant, and it was inconclusive regarding whether the defendant was a contributor.

Steve Scott, who is employed with the firearms identification unit of the TBI, testified that the victim's clothing did not have gunshot residue, which could mean that the gunshots were fired from more than four feet away or it could mean that they were fired from closer but something interfered with the residue. The bullet recovered from the victim's head was a .45 caliber bullet which exhibited riffling produced by guns made by Hi-Point firearms company. The bullet recovered from the doorway was also a .45 caliber bullet, and it was fired from the same weapon that fired the bullet that lodged in the victim's head. The bullet from the victim's arm was a .38 or .357 bullet. Agent Scott determined that the two .45 caliber casings found at the scene "had been fired in one firearm and one firearm only," which was manufactured by Hi-Point. Agent Scott testified that none of the firearms sent to him in the investigation had fired the bullets. He acknowledged that the gun which fired the bullet in the victim's arm could have been a .357 caliber weapon. He also acknowledged that a custom-made weapon which was not a Hi-Point firearm might have fired the .45 caliber bullets.

During trial, the court revisited the issue of the loss of the telephone. Defense counsel stated that there was an internal investigation into the failure to recover the telephone and that an investigator had found that Lieutenant McPherson was not being truthful. The trial court found that it was "improper" that the telephone had not been collected. However, the court found that there would be no exculpatory value in Mr. Butler's telephone for the defendant.

After the close of the State's proof, the State objected to the trial court's intention to give an instruction on lost evidence with regard to the partial recording of the defendant's statement. Relying on *State v. Joshua Eugene Anderson*, No. E2005-02660-CCA-R3-CD, 2007 WL 1958641, at *8 (Tenn. Crim. App. July 6, 2007), the trial court elected not to give the jury charge.

The jury found the defendant guilty of first degree felony murder, attempted especially aggravated robbery, attempted second degree murder as a lesser included offense of attempted first degree murder, and employment of a firearm during the

-9-

commission of a dangerous offense. The defendant received a life sentence for the felony murder, fifteen-year sentences for the especially aggravated robbery and the attempted second degree murder, and a six-year sentence for the weapons offense. The weapons offense was ordered to run consecutively to the attempted second degree murder conviction, and the other sentences were ordered to be served concurrently with one another. The defendant appeals, challenging the sufficiency of the evidence, the trial court's failure to dismiss the indictment based on the lost telephone, and the trial court's failure to suppress the partially-recorded statement.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant does not contest the sufficiency of the evidence for the felony murder conviction. However, he contends that the victim of the other convictions was Mr. Westfield and that the defendant cannot be held criminally responsible for those offenses because his actions were limited to assisting in the attempted robbery of Mr. Hughes. Initially, we note that, contrary to the defendant's contention, the victim in the attempted especially aggravated robbery conviction was not Mr. Westfield but the murder victim, Mr. Hughes.

Under Tennessee Rule of Appellate Procedure 13(e), "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." The question before the appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts of evidence in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that can be drawn from it. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). A guilty verdict replaces the presumption of innocence with one of guilt, and on appeal, the defendant bears the burden of demonstrating that the evidence is insufficient to support the conviction. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). The elements of an offense may be established exclusively by circumstantial evidence, and the standard of

review is the same for direct and circumstantial evidence. *State v. Echols*, 382 S.W.3d 266, 283 (Tenn. 2012). Circumstantial evidence may, by itself, support a conviction, and the State is not required to exclude every reasonable hypothesis save guilt. *Hawkins*, 406 S.W.3d at 131.

A killing committed in the perpetration of or attempt to perpetrate a robbery is felony murder. T.C.A. § 39-13-202(a)(2). The State need only show the intent to commit the underlying felony. T.C.A. § 39-13-202(b). A person acts intentionally when it is the person's "conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a).

To convict the defendant of attempted especially aggravated robbery, the State had to show that the defendant intended to commit especially aggravated robbery and that he acted with intent to cause a result that is an element of especially aggravated robbery and that he believed "the conduct would cause the result without further conduct" on the defendant's part. T.C.A. § 39-12-101(a)(2). Especially aggravated robbery requires the State to prove the intentional or knowing theft of property from the person of another by violence or putting the person in fear, when the robbery is accomplished with a deadly weapon and the victim suffers serious bodily injury. T.C.A. §§ 39-13-403(a), -401(a).

For the attempted second degree murder conviction, the jury was charged that State had to show that the defendant intended to commit second degree murder, that the defendant engaged in an act intending to cause a result that is an element of second degree murder, and that he believed the conduct would cause the result without further action. T.C.A. § 39-12-101(a)(2). Second degree murder is the knowing killing of another. T.C.A. § 39-13-210(a)(1).

Tennessee Code Annotated section 39-17-1324 prohibits armed dangerous felonies. The statute makes it an offense to employ a firearm during the commission of or attempt to commit a dangerous felony. T.C.A. § 39-17-1324(b). Attempt to commit first degree murder and attempt to commit second degree murder are statutorily defined as dangerous felonies. T.C.A. § 39-17-1324 (i)(1)(A), (B).

The jury was also charged with the theory of criminal responsibility. A person is criminally responsible for the conduct of another when "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." T.C.A. § 39-11-402(2).

Criminal responsibility is not an offense but a theory by which the State may prove guilt based on another's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim.

-11-

App. 2007). The justification for the theory is that aiders and abettors should be held accountable for the harms they intentionally initiated or facilitated. *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008). Mere presence during the commission of a crime cannot establish criminal responsibility. *Id.* However, neither is physical participation necessary. *Id.* "[E]ncouragement of the principal is sufficient." *Id.* Criminal responsibility also extends guilt to "'*any other crime committed by the other in pursuance of the common purpose, or as a natural or probable consequence thereof.*'" *State v. Carson*, 950 S.W.2d 951, 954 (Tenn. 1997) (emphasis in *Carson*) (quoting *Key v. State*, 563 S.W.2d 184, 186 (Tenn. 1978)). "The doctrine extends the scope of criminal liability to the target crime intended by a defendant as well as to other crimes committed by a confederate that were the natural and probable consequences of the commission of the original crime." *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000). The question of whether the offense committed was a natural and probable consequence of the underlying crime falls within the province of the jury. *Id.*

Here, the defendant admitted that he helped to plan the robbery, that he drove the assailants to the victim's home, and that he expected to be compensated from the proceeds of the robbery for his role. The jury determined that the offenses against Mr. Westfield were a natural and probable consequence of attempting to rob the murder victim at gunpoint. Accordingly, the defendant was criminally responsible for the attempted second degree murder of Mr. Westfield and the weapons offense despite the fact that his plan to rob the murder victim did not specifically include a plan to shoot Mr. Westfield. *See State v. Dickson*, 413 S.W.3d 735, 744 (Tenn. 2013) ("A natural and probable consequence of this attempt to obtain money and drugs by force was the shooting of two unarmed victims."). There were numerous details corroborating the defendant's confession, including that the bullets and casings were of the same caliber and manufacture as the weapons the defendant identified as being used in the crime, that a small sized men's shoe with DNA consistent with Mr. Butler's was found at the scene, that a black facial wrap and teal bandana were found in Ms. Angel's car, that Ms. Angel's car was consistent with the car identified by Mr. Westfield, that the defendant recounted that Mr. Butler had made a demand for the victim's possessions, and that the defendant's account of the crime was otherwise generally consistent with that of Mr. Westfield. The assailants accomplished attempted murder of Mr. Westfield through the employment of a firearm. *See* T.C.A. § 39-17-1324(b), (i)(1).

The State put on sufficient evidence that a rational trier of fact could have found the elements of all of the offenses were established either through the defendant's own conduct or through the conduct of co-defendants for whom he was criminally responsible. Accordingly, the defendant is not entitled to relief.

## II. Lost or Destroyed Evidence

The defendant also asserts that he is entitled to relief due to the State's failure to preserve co-defendant Butler's telephone and the State's failure to record the defendant's entire statement. The State counters that Mr. Butler's telephone had no exculpatory value and that *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999) does not apply to the failure to record the entire statement.

The accused in a criminal trial is guaranteed the right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution. Part of the right to a fair trial is the "constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment." *Ferguson*, 2 S.W.3d at 915. In *Ferguson*, the Tennessee Supreme Court rejected the argument that the defendant must show that lost evidence was due to bad faith actions undertaken by State actors. *Id.* at 916-17. Instead, when a defendant alleges that his right to a fair trial has been compromised by the loss of evidence, the court must first determine whether the State had a duty to preserve the evidence. *Id.* at 917. This duty is "difficult to define" but generally includes the duty to preserve all evidence subject to discovery and inspection under Tennessee Rule of Criminal Procedure 16. *Id.* The inquiry focuses on whether the evidence is "constitutionally material" – in other words, "the evidence must potentially possess exculpatory value." *State v. Merriman*, 410 S.W.3d 779, 785 (Tenn. 2013). The evidence must also be of such a nature that "the defendant would be unable to obtain comparable evidence by other reasonably available means." *Ferguson*, 2 S.W.3d at 917 (quoting *California v. Trombetta*, 467 U.S. 479, 489 (1984)).

Before the duty to preserve evidence arises, the evidence "must be expected to play a significant role in [the defendant's] defense." *Merriman*, 410 S.W.3d at 792. Because it is lost, the court may be "unable to assess the precise nature of the evidence." *Id.* at 793. Accordingly, the evidence must only be "potentially exculpatory" in nature. *Id.* at 784, 792 (concluding that video of traffic stop which could have been beneficial to either the prosecution or the defense held "potential" exculpatory value).

If the court determines that the State had a duty to preserve the lost evidence, then it must evaluate (1) the degree of negligence involved in the loss; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of the other evidence used at trial to support the conviction. *Ferguson*, 2 S.W.3d at 917. Regarding the third factor,

-13-

when the State's evidence is overwhelming, a trial court may determine that the lost evidence is less significant. On the other hand, when the State's case is legally sufficient but is based on minimal evidence, the trial court may find the same lost evidence to be more significant when it considers all of the evidence and balances the other *Ferguson* considerations.

*Merriman*, 410 S.W.3d at 787.

A trial court's decision concerning whether a trial without the missing evidence would be fundamentally unfair is reviewed de novo. *Id.* at 791. Factual determinations made by the trial court in assessing whether there was a constitutional violation are conclusive on appeal unless the evidence preponderates against them. *Id.* The trial court's remedy is reviewed for abuse of discretion. *Id.* at 791-92. A trial court commits an abuse of discretion when it applies an incorrect legal standard or it reaches a decision that is against logic or reasoning and that causes an injustice to the complaining party. *Id.* at 791.

### A. Failure to Collect Mr. Butler's Telephone

The defendant claims that the failure to collect Mr. Butler's telephone should result in dismissal of the indictment because the telephone constituted evidence which was potentially exculpatory. The State initially argued that this issue was waived for failure to include a transcript of the motion to dismiss, but the record was later supplemented with the transcript, and the issue is properly before us.

Here, the telephone of Mr. Butler, a co-defendant, was not collected due to the order given by Lieutenant McPherson. Lieutenant McPherson's niece was a witness to the crime, and the defendant attempted to imply that she had "something to do with" the crime. The trial court's finding indicates that Lieutenant McPherson's order was given in bad faith, concluding that there was "no question" that the failure to collect the telephone was "improper." Investigator Wenger testified that he wanted to collect the telephone, believed it might hold important evidence, and did not collect it because he had to follow orders from his superiors. Investigator Wenger believed that he was able to obtain some of the information which may have been on the telephone from call records. He stated that he did not recover data which would have been stored in the telephone itself.

In order to be entitled to relief, the defendant must show that Mr. Butler's telephone was constitutionally material evidence *as to the defendant*. In other words, he had to show that the telephone held potentially exculpatory evidence as to him and that he was unable to obtain comparable evidence from an alternate source. *Merriman*, 410

S.W.3d at 785. The defense also had to show that the evidence "might be expected to play a significant role in the suspect's defense." *Id.* (quoting *Ferguson*, 2 S.W.3d at 917).

The circumstances behind the failure to collect the telephone are troubling. Investigator Wenger stated that he wanted to collect the telephone and believed it might have evidentiary value, but he was prevented from doing so. Due to his lack of expertise, he was not able to thoroughly examine the telephone's contents. Lieutenant McPherson had a personal connection to a witness to the crime, and he could offer no rationale for having prevented the seizure of the telephone. The trial court found that the order to refrain from collecting the telephone was "improper."

Nevertheless, the defendant does not on appeal offer any theory of how the telephone would have been constitutionally material evidence as to him. [1] While the location of the telephone might have some bearing on Mr. Butler's whereabouts at the time of the crime, it is difficult to conceive how Mr. Butler's telephone could contain information that was exculpatory as to the defendant, who acknowledged his role in planning the robbery and gave numerous details corroborated by other witnesses and by the physical evidence. Moreover, the threshold inquiry in *Ferguson* requires the defendant to show that comparable evidence was not available from an alternate source, and Investigator Wenger testified that he believed that he was able to obtain Mr. Butler's telephone records. We conclude that the defendant has not shown that the lost evidence was constitutionally material as to him or unavailable from an alternate source.

We further note that Mr. Butler raised the same issue on direct appeal in his case and that a panel of this court concluded that the telephone was not constitutionally material evidence as to Mr. Butler and that there was no duty to preserve it. *State v. Harold Francis Butler*, No. E2014-00631-CCA-R3-CD, 2015 WL 2233122, at *5 (Tenn. Crim. App. May 11, 2015), *perm. app. denied* (Tenn. Sept. 17, 2015). Accordingly, we conclude that the defendant is not entitled to relief.

### B. Malfunction of Recording Equipment

The defendant also argues that the State failed to preserve evidence when Investigator Wenger's recording device first ran out of battery and subsequently ran out of memory. The trial court initially ruled that it would give the jury an instruction regarding the State's failure to record the entire interview, but it ultimately concluded that

---

[1] At the hearing, the trial court was presented with the argument that the telephone might have contained evidence of the crime being planned by other co-defendants. No proof was introduced regarding whether such communications were available from an alternate source, such as the co-defendants' cellular telephones or telephone records.

the State had no duty to record the interaction. The State noted the absence of the transcript of the motion to suppress from the record and asserted that any related issues were waived.

The transcript of the motion to suppress hearing is not included in the appellate record, but the record does contain the parties' subsequent arguments made during trial and the trial court's decision not to give a jury instruction. The appellant has the duty to prepare a record which conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). In the absence of a transcript, we presume that the trial court's judgments were correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Accordingly, we presume that the trial court's findings based on the evidence introduced during the motion to suppress were correct. We proceed to consider whether the defendant has demonstrated any error in the trial court's subsequent ruling on the issue.

The trial court relied on *State v. Joshua Eugene Anderson* and *State v. Linda H. Overholt* in concluding that no jury instruction should be given. *See State v. Joshua Eugene Anderson*, No. E2005-02660-CCA-R3-CD, 2007 WL 1958641 (Tenn. Crim. App. July 6, 2007); *State v. Linda H. Overholt*, No. E2003-01881-CCA-R3-CD, 2005 WL 123483 (Tenn. Crim. App. Jan. 21, 2005). In *Joshua Eugene Anderson*, the defendant gave a statement which police attempted to video record. *Joshua Eugene Anderson*, 2007 WL 1958641, at *3. Because the video equipment malfunctioned, only the defendant's "final statement," which was audio recorded, was available at trial. *Id.* This court held that because the State had no duty to record the interview, the threshold inquiry in *Ferguson* was not met. *Id.* at *8. In *Linda H. Overholt*, the defendant was interviewed by police, but the device did not record any sound during the first twenty-seven minutes of the interview due to a malfunction. *Linda H. Overholt*, 2005 WL 123483, at *3, 5. This court held that the State had no duty to preserve the interview via recording and that therefore the defendant was not entitled to relief under *Ferguson*. *Id.* at *6.

The trial court did not err in concluding that the failure to record the entirety of the interview does not entitle the defendant to relief under *Ferguson*. Although there was some evidence that the malfunction was the result of negligence, *Ferguson* concerns evidence which existed at one point and was subsequently lost or destroyed. In this case, the evidence was simply never in existence. *See State v. Angela K. Pendergrass*, No. E2013-01409-CCA-R3-CD, 2014 WL 1232204, at *7 (Tenn. Crim. App. Mar. 25, 2014), *perm. app. denied* (Tenn. Aug. 26, 2014) (noting that *Ferguson* "does not require the *creation* of evidence"); *State v. Randall S. Sparks*, No. M2005-02436-CCA-R3-CD, 2006 WL 2242236, at *5 (Tenn. Crim. App. Aug. 4, 2006) ("[W]e can find no case law in this state that indicates that *Ferguson* applies to evidence that never existed."); *see also*

*Merriman*, 410 S.W.3d at 794 (concluding that "[t]he State had no duty to create a video recording of Ms. Merriman's traffic stop" and that only after the recording was made did it become part of the State's evidence). Because the State did not have a duty to create this evidence by recording the entirety of the interview, the defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing analysis, the judgments of the trial court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE